UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| STORM ERIE and GLENN STELLY II, individuals, | ) ) ) | CIVIL ACTION |
| | ) | Case No: |
| Plaintiffs, | ) ) | |
| | ) | JUDGE |
| v. | ) ) | |
| | ) | MAGISTRATE JUDGE |
| STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, as the political entity responsible for the Eastern Louisiana Mental Health System; and DR. COURTNEY N. PHILLIPS, in her official capacity as Secretary, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | |

## COMPLAINT

In *Olmstead v. L.C.*, the United States Supreme Court clearly stated that individuals with disabilities in mental health facilities must be afforded meaningful community placement options and that the Americans with Disabilities Act contains an integration mandate.[1] This means that people in mental health facilities must be given the opportunity to receive services in the most integrated setting appropriate to their needs. The U.S. Department of Justice has explained that "Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible. Evidence-based practices that provide

---

[1] 527 U.S. 581 (1999).

scattered-site housing with supportive services are examples of integrated settings."[2]

In Louisiana, however, most individuals with psychiatric disabilities found not guilty by reason of insanity end up at one facility: The Eastern Louisiana Mental Health System ("ELMHS").[3] This facility was opened more than 170 years ago and, in early 2019 , the Louisiana Department of Health described the facility as "deplorable, antiquated and quickly deteriorating[.]" The COVID-19 pandemic has escalated the situation to new heights. As is set forth below, individuals infected with COVID-19 are eating, sleeping, and going to the bathroom in immediate proximity to non-infected individuals; the housekeeping staff is not cleaning the facility, resulting in maggots and bugs in the drains; and the residents are getting sick and dying. Indeed, over two weeks ago the State of Louisiana admitted that more than twenty (20) percent of the patients at the ELMHS had contracted COVID-19 and six of them have died due to the illness. Given the conditions and the passage of time, these numbers are likely substantially higher.

Plaintiffs, STORM ERIE and GLENN STELLY II, individuals, by and through their undersigned counsel, file this Complaint and sue the STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, as the political entity responsible for the Eastern Louisiana Mental Health System, and DR. COURTNEY N. PHILLIPS, in her official capacity as Secretary, pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("Americans with Disabilities Act" or "ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act" or "RA"), Section 1557 of the Patient Protection and

---

[2] See U.S. Department of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C., https://www.ada.gov/olmstead/q&a_olmstead.htm (last accessed 2020/5/12).

[3] The phrase "not guilty by reason of insanity" is offensive to many individuals in the disability community. Nonetheless, said phrase is used in several places in this Complaint because it is still the phrase used in Louisiana law.

Affordable Care Act, 42 USC § 18116 *et seq.* ("Section 1557" or "ACA"), and state as follows:

## JURISDICTION AND PARTIES

1.  This is an action for damages and attorneys' fees/costs pursuant to the ADA, Rehabilitation Act, and Section 1557, each of which are federal causes of action. This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

2.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the discrimination which is the subject of this action occurred in East Feliciana Parish, Louisiana.

3.  Plaintiff GLENN STELLY is a resident of the State of Louisiana.

4.  MR. STELLY is a qualified individual with a disability under the ADA/RA/ACA. MR. STELLY has a psychiatric impairment. Upon information and belief, MR. STELLY was diagnosed with delusional disorder. Upon information and belief, MR. STELLY's diagnosis was changed to schizophrenia.

5.  Upon information and belief, MR. STELLY's disability impacts his major life activities, such as thinking and cognition.

6.  Additionally, MR. STELLY is a qualified individual with a disability under the ADA/RA/ACA because he has a record of such an impairment.

7.  Plaintiff STORM ERIE is a resident of the State of Louisiana.

8.  MR. ERIE is a qualified individual with a disability under the ADA/RA/ACA. Upon information and belief, MR. ERIE was diagnosed with bipolar disorder. Upon information and belief, MR. ERIE suffers from manic episodes.

9.  Upon information and belief, MR. ERIE's disability impacts his major life activities, such as thinking and cognition.

3

10.    Additionally, MR. ERIE is a qualified individual with a disability under the ADA/RA/ACA because he has a record of such an impairment.

11.    Upon information and belief, to the extent MR. ERIE and MR. STELLY are not qualified individuals with a disability under the ADA/RA/ACA, they are persons who Defendants regard as having such an impairment because they have been subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, one of their major life activities.

12.    MR. ERIE and MR. STELLY are currently being held in ELMHS, which is located at 4502 State Route 951 in Jackson, Louisiana 70748.

13.    Upon information and belief, MR. ERIE and MR. STELLY are currently being detained at the ELMHS, but, upon information and belief, they are not prisoners because they are psychiatric patients.

14.    Upon information and belief, ELMHS is the location of the only state-operated forensic division in Louisiana.

15.    Defendant STATE OF LOUISIANA, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS is the political entity responsible for the operation of the Eastern Louisiana Mental Health System (hereinafter "LDOH").

16.    Defendant DR. COURTNEY N. PHIILIPS (hereinafter "PHILLIPS") is the Secretary of the Department of Health, is the chief executive of that governmental entity, and is sued herein pursuant to the doctrine of *Ex parte Young*.

17.    Defendants are responsible for complying with the obligations of the ADA/RA/ACA.

18.    The Department of Health is a public entity and, as such, is subject to the ADA/RA/ACA.

19. PHILLIPS is currently the chief executive and is sued solely under the doctrine of *Ex parte Young* because she has the ability to enforce Orders issued by this Court.

20. All events giving rise to this lawsuit occurred in the State of Louisiana.

## COUNT I
## VIOLATION OF TITLE II OF THE ADA

21. Plaintiffs reallege and reaver paragraphs 1-20 as if they were expressly restated herein.

22. Upon information and belief, the LDOH's employees/agents develop and provide the services offered at the ELMHS.

23. As is set forth above, the U.S. Department of Justice has referred to the following as an integrated setting:

"Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible. Evidence-based practices that provide scattered-site housing with supportive services are examples of integrated settings."[4]

24. Hereinafter the phrase "Community Based Integration" refers to the Department of Justice's description of an integrated setting and evidenced-based practices that provide scattered-site housing with supportive services.

25. Until the 1980s, most people with significant disabilities were institutionalized in large, state-operated institutions such as psychiatric hospitals.

26. In the wake of *Olmstead*, the early model of Community Placement Integration in other

---

[4] See *U.S. Department of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C., https://www.ada.gov/olmstead/q&a_olmstead.htm (last accessed 2020/5/12).

states was "step-down" housing models where people "progress" through housing, going from more to less restrictive models. In this model, people with disabilities have to move as their service needs change.

27.    In the wake of *Olmstead*, however, the current model of Community Placement Integration calls for people with disabilities to live like people without disabilities. Specifically, this means movement away from congregate, disability-specific housing to people with disabilities living in their own apartments or homes scattered in the community.[5]

28.    The purpose of this approach is to ensure that flexible services are available to people in their own homes and communities. One should not move when their needs change.

29.    Unfortunately, as is pertains to individuals housed at ELMHS, the State of Louisiana has failed to comply with its obligations under *Olmstead*.

Background Facts on the Eastern Louisiana Mental Health System and the Lack of Meaningful Community Based Integration

30.    The Eastern Louisiana Mental Health System is psychiatric hospital operated by the Louisiana Department of Health ("LDOH"). The facility has been operating for approximately 170 years. Indeed, the main building dates back to 1848.

31.    Upon information and belief, in a 2018 or 2019 request for funding by the LDOH, the LDOH has referred to the ELMHS facility as "deplorable, antiquated and quickly deteriorating".

32.    The ELMHS includes a main campus and a maximum-security satellite location, which operate more as a prison than a hospital. Patients spend months or years in a health care

---

[5] See, e.g., *Housing for People with Disabilities: A Civil Rights Lens* http://ohioplanning.org/aws/APAOH/asset_manager/get_file/97346?ver=10388 (last accessed on 2020/5/12).

facility that LDOH has condemned.

33. Upon information and belief, in the 2018 or 2019 request for funding, the LDOH wrote that "Physical condition of buildings, roadways, utilities and supporting infrastructure is deplorable, antiquated and deteriorating quickly," the department wrote in its request for funding. "Buildings and facilities are becoming unsafe and are not conducive to a therapeutic environment."

34. The buildings currently used for treatment resemble deteriorating, 1970s-era public school buildings. An on-campus Secure Forensic Facility called a "group home" is the size of a hotel.

35. In 2016, the State of Louisiana settled a lawsuit concerning people languishing in jails while waiting for a bed in ELMHS because of overcrowding. The lawsuit alleged that people charged with crimes and found incompetent to stand trial or found not-guilty by reason of insanity were not getting adequate mental health treatment waiting in jail cells. The state agreed to move people to the mental hospital within hours or days, depending on the severity of their condition.

36. The rate of new patients entering ELMHS has steadily increased. In 2012, ELMHS added an average of 18 new patients per month. By June 2017, the monthly average had climbed to 27 new patients per month, with a total of 595 beds. By 2018, ELMHS was housing more than 640 patients.

37. In response to reports of 61 patients testing positive for COVID-19 at ELMHS, the Press Secretary for LDOH stated that that total reflected less than 10% of the total patient population. Thus, ELMHS currently houses more than 610 patients.

38.    To deal with the influx of individuals with disabilities the LDOH responded not by building a new facility or by developing meaningful community placement options but, instead, by cramming more beds into the ELMHS. Upon information and belief, in the 2018 fiscal year, 86 beds supported by 76 new job positions were added for a cost of $6.6 million. In the 2019 fiscal year, in a second phase of the expansion, the state intended to add 72 beds, including 20 beds in community group homes, for a cost of $9.1 million.

39.    The State's only other state-operated mental hospital, Central Louisiana State Hospital in Pineville, has been reduced to only 120 beds, consisting of mostly patients from the surrounding community.

40.    Indeed, in a 2017 interview with the media concerning increased violence at ELMHS and the reduction of capacity at Pinecrest, the Chief Executive Officer of ELMHS—Mr. Hampton Steve Lea—admitted that "We can't move our patients anywhere else. We don't have an option."

41.    Further, in a 2014 study by the National Association of State Mental Health Program Directors, Louisiana had the lowest number of mental health residential facilities and the second-lowest number of mental health residential treatment facilities nationwide.

42.    Quite simply, in Louisiana individuals with psychiatric disabilities that are found not competent to stand trial or found not guilty by reason of insanity have essentially one option: the deplorable, antiquated, and quickly deteriorating ELMHS.

43.    Instead of developing a comprehensive system to provide Community Based Integration, the LDOH has chosen to warehouse individuals with mental disabilities—and individuals who no longer have mental disabilities—at ELMHS.

44.     The LDOH's choice to warehouse individuals with disabilities at the ELMHS instead of providing Community Based Integration violates Title II of the ADA.

45.     For example, the LDOH has failed to provide Plaintiffs with equivalent educational opportunities as compared to non-disabled individuals who reside in the community. Upon information and belief, at the ELMHS, there are no college courses or advanced study opportunities for individuals with disabilities.

46.     In contrast, however, individuals residing in the community can take classes through in-person enrollment at a university, online study, etc. By failing to provide Community Based Integration to individuals with psychiatric disabilities, Defendants have failed to provide equivalent educational opportunities to Plaintiffs and other individuals with disabilities who are confined at ELMHS.

47.     Further, upon information and belief, patients at ELMHS have significantly limited freedom of movement or ability to keep themselves sane. Recreation time is twice a day that occurs in normal times, one hour at ten and another at two. If Plaintiffs were provided Community Based Integration, they could engage in their own, private recreation with greater frequency and regularity.

48.     Upon information and belief, there are no structured activities, only television and radio. Many of the residents just sleep during this time. If Plaintiffs were provided Community Based Integration, they could utilize structured activities provided through the community.

49.     Upon information and belief, once a week there is an opportunity to exercise. However, upon information and belief, there is not enough equipment for everyone to use. If Plaintiffs were provided Community Based Integration, they could exercise with greater frequency

and regularity.

50.  The operators of the ELMHS are well aware of their obligation to provide Community Based Integration. The ELMHS is a member of the Southern State Psychiatric Hospital Association ("SSPHA"), which was "established to assist member state hospitals to carry out their mission more effectively in the mental health system by addressing issues involving treatment, administration, standards and systems."

51.  The SSPHA offers various resources, including Webinars for its members. One of the latest Webinars was entitled "Bridging the Gap" and was published on October 27, 2017. This Webinar discusses the importance of the integration mandate in *Olmstead*, the importance of community placement for persons with psychiatric, methods and best practices for community placement, and strategies for the same.

52.  Quite simply, the LDOH is a member of an organization that has actively published materials and guidelines establishing what the LDOH is required to accommodate persons with disabilities. But instead of accommodating individuals with disabilities, the LDOH, through the ELMHS, is failing individuals with disabilities by simply warehousing them at ELMHS.

53.  As stated above, Mr. Lea of the ELMHS admitted that there is nowhere that the ELMHS can send individuals with mental health disabilities.

54.  This problem has been known to the LDOH for years. On February 12, 2014, the LDOH (then the Department of Health & Hospitals) published a Request for Information to transition a marginal number of its patients to "secure supervised living arrangements in New Orleans…" The LDOH set forth guidelines for applicants to apply to provide

supervised care to 22-28 residents.

55.     Incredibly, in its Request for Information, the LDOH admitted that individuals who were

no longer in need of hospitalization at the ELMHS were nonetheless being housed at the

ELMHS due to the lack of Community Based Integration options.

56.     Specifically, the LDOH stated:

> "Persons suffering from mental illness and who have been ordered to
> Eastern Louisiana Mental Health System by the courts for treatment often
> are limited as to options for placement when a conditional release may be
> possible. Many of these clients remain at the hospital for extended periods
> of time after reaching maximum benefit, therefore occupying a needed bed.
> In turn, the forensic clients in jails throughout the state who are in need of
> inpatient services must wait longer for a bed to open. Due to this situation,
> a Forensic Supervised Transitional Residential Aftercare program with an
> array of services is needed to provide options for these clients to obtain a
> conditional release from the courts and to prepare them for transition to a
> less restrictive environment. Although many of these clients may be very
> functional when their mental illness is being managed, the courts are most
> often reluctant to grant a full release prior to the client being observed in
> such a setting.
>
> The purpose of this program is to provide appropriate, supervised housing
> while continuing with such services as daily living skills, symptoms
> management, legal rights, etc. Cooperation/communication with
> Community Forensic Services (CFS) and the District Forensic Coordinators
> (DFC) will be an integral part of the client's treatment." (emphasis added).

57.     Through the above statement, the LDOH admitted that, due to its failure to provide

Community Based Integration, individuals with psychiatric disabilities are languishing at

ELMHS even though they have reached maximum benefit and a conditional release may

be possible.

58.     On March 28, 2014, the LDOH (then the Department of Health & Hospitals) published a

Request for Information that admitted that is lacked sufficient "surge capacity" during an

emergency.

59.    In the request, the LDOH stated:

> "The Office of Behavioral Health (OBH) currently operates two state psychiatric treatment facilities that operate at bed capacity. During an emergency event, there are **no** available state-owned adult psychiatric beds to accommodate psychiatric surge needs." (emphasis original).

60.    Through this Request for Information, the LDOH acknowledged the existence of a serious problem: Despite having approximately seven hundred occupied beds, it had zero beds to accommodate an emergency event.

61.    In the March 28, 2014, the LDOH sought to obtain surge capacity of between 4 and 20 beds.

62.    Upon information and belief, the surge capacity that the LDOH sought to add in 2014—between 4 and 20 beds—was woefully below the actual need, considering that ELMHS has capacity for more than seven hundred individuals.

63.    In the six years since the 2014 Requests for Information, the ELMHS has slightly increased its capacity, see paragraph 38, *infra*. At the same time, however, an increasing number of individuals with psychiatric disabilities have been routed from jails and prisons to the ELSMHS, see paragraph 35, *infra*. Thus, the burden on Louisiana's psychiatric facilities has only increased.

64.    Further, while in 2014 the LDOH requested modest increases in community placement beds and surge capacity, undersigned has been unable to locate any evidence that the LDOH has subsequently taken any steps to provide Community Based Integration or to procure emergency surge beds. As is set forth below, this has had terrible consequences for individuals with psychiatric disabilities in Louisiana.

<u>Background Facts on the Impact of COVID-19 on Institutionalized Persons</u>

65. There are widespread reports of COVID-19 infections spreading wildly through detention centers, prisons, and state mental hospitals.

66. By April 27, 2020, there were reports of COVID-19 outbreaks in psychiatric facilities in Connecticut, Delaware, Kentucky, Louisiana, Maryland, Missouri, Michigan, Nevada, New Jersey, Washington, Wisconsin, and Washington, D.C. At least 63 state psychiatric hospitals have reported cases of COVID-19.

67. Patients in state mental hospitals are at high risk for infection because many are elderly, have chronic medical conditions, and are on medications that may compromise their immune systems.

68. The layout of psychiatric wards provides many challenges for containing the spread of COVID-19. Alcohol-based hand sanitizer is an ingestion hazard, rooms are sparse and have multiple beds with sealed windows, the hallways are narrow, and staff members move between wards. Social distancing is nearly impossible because many patients require hands-on care and/or physical restraint. Many psychiatric facilities are in old buildings that lack enough space for proper seclusion protocols. Put simply, these facilities are designed to keep people together, which means that stopping the spread of COVID-19 once it has entered a facility is nearly impossible.

69. Many psychiatric facilities also lack adequate resources, such as tests and PPE, to stop the spread of COVID-19. Some patients do not understand the need to cough or sneeze into their arms and to avoid physical contact with others. It is almost impossible to enforce physical distancing protocols in a crowded facility.

<u>The Current Situation at the Eastern Louisiana Mental Health System and Plaintiffs' Requests
for Reasonable Accommodation/Modification</u>

70.    Upon information and belief, to date Plaintiffs have not been released from ELMHS and
Plaintiffs are not being provided with Community Based Integration.

71.    Upon information and belief, if the LDOH provided Community Based Integration, it
would enhance Plaintiffs' eligibility for accelerated release from ELMHS.

72.    According to MR. ERIE, during the week of April 27, 2020, individuals infected with
COVID-19 were not being quarantined. According to MR. ERIE, the ELMHS staff were
going to put infected people in a detached building on the property, but that it reached
capacity. MR. ERIE reports that there are infected people in nearby crowded rooms, on the
same hall/ward; MR. ERIE estimates that there are now 9 cases in his ward of 25 patients.

73.    Likewise, MR. STELLY was moved into a room with two others <u>after</u> his previous
roommates became infected.

74.    According to MR. ERIE, the staff says that Ward 1—which was meant to be a quarantine
ward—is full. During the week of April 27, 2020, residents are being moved into
MR. ERIE and MR. STELLY's ward when sick, and other people are being shuffled
around seemingly at random.

75.    MR. STELLY has reported that individuals infected with COVID-19 are eating, sleeping,
and going to the bathroom in immediate proximity to non-infected individuals.

76.    MR. STELLY has reported that the housekeeping staff are not cleaning the facility,
resulting in maggots and bugs in the drains.

77.    Upon information and belief, the filthy conditions are only worsening the spread of

COVID-19.

78.    Most alarmingly, based on the reports of MR. ERIE and MR. STELLY, as of the week of April 27, 2020, there has been little to no effort on the part of the staff to keep the patients socially distant. The patients are still made to eat in a communal dining hall where they sit merely a foot apart and eat. Consequently, individuals cannot wear masks.

79.    According to MR. ERIE, even those who have tested positive are made to eat in the dining hall. All patients also must line up together to receive their medications, including those that have tested positive.

80.    Plaintiffs' reports of the rampant spread of COVID-19 at the ELMHS are corroborated by media reports. According to an April 27, 2020 article on the situation at ELMHS, six individuals had already died after having contracted COVID-19 at ELMHS and more than twenty (20%) percent of the patients there had contracted COVID-19.[6]

81.    On April 30, 2020, undersigned counsel sent the Department of Health a request for reasonable accommodation/modification on behalf of MR. STELLY and MR. ERIE. The document started with the verbiage "important legal notice" and "request for reasonable accommodation / reason modification" in bold and capital letters at the top of the correspondence.

82.    The request was sent to the Department of Health via fax, U.S. Mail, and email. To date, undersigned has not received any notifications that the correspondence failed to transmit (*e.g.*, an email "return to sender").

83.    Plaintiffs' request for reasonable accommodation / modification is attached to this

---

[6] https://www.theadvocate.com/baton_rouge/news/coronavirus/article_15d692fe-88d1-11ea-8ff0-5f70e8a7d653.html (last accessed 5/11/2020).

Complaint as Exhibit "A."

84. By and through the above letter, Plaintiffs explained the nature of their disability, their limitations, and their needed accommodations.

85. In their written request for accommodation, Plaintiffs requested the following accommodations:

- "Develop a comprehensive outpatient treatment program for individuals with disabilities;
- Release Mr. Erie and Mr. Stelly from the Eastern Louisiana Mental Health System while the above comprehensive outpatient treatment program is being developed.
- Assess what auxiliary aids/services Mr. Erie and Mr. Stelly may need to function on an outpatient basis (e.g., personal assistant, medications, etc.) and ensure that Mr. Erie and Mr. Stelly are provided these auxiliary aids/services on a consistent and regular basis.
- Adequate funding of the above system.
- Adequate training to the Louisiana Department of Health staff on accommodating individuals with disabilities, including psychiatric disabilities.
- Provide ongoing assessment of Mr. Erie and Mr. Stelly's needs as persons with a disability."

86. To date, undersigned has received no response whatsoever to their clients' request for reasonable accommodation/modification.

87. To date, Defendants made no attempt to engage in a good-faith, interactive dialogue with Plaintiffs through their counsel of record.

88. By and through this this action, Plaintiffs do not ask for immediate release or seek the entitlement to such relief. Instead, Plaintiffs request that Defendants to be Ordered to comply with the requirements of ADA/RA/ACA, which would enhance their likelihood of Community Based Integration.

89. Despite receipt of Plaintiffs' request for reasonable accommodation/modification, Defendants have refused to confer with Plaintiffs' civil rights counsel. In fact, Defendants

have completely failed to respond to Plaintiffs' request for reasonable accommodation.

90.    Instead of working to accommodate Plaintiffs—or confer with their civil rights counsel—Defendants have maintained individuals with disabilities at a decrepit facility.

91.    Upon information and belief, if Plaintiffs had been moved to community placement at small group homes prior to the outbreak of COVID-19 at ELMHS, there is a substantially increased chance that they would not have been exposed and/or infected with COVID-19.

92.    Defendants' ongoing failure to provide Plaintiffs with a reasonable accommodation and/or to provide Community Based Integration was caused solely and proximately by Defendants' refusal to comply with the requirements of the ADA/RA.

93.    By and through the facts set forth above, Defendants have utilized criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

94.    By and through the facts set forth above, Defendants have failed to make reasonable modifications in their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

95.    By and through the facts set forth above, Defendants have failed to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

96.    By and through the facts set forth above, Defendants have failed to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.

97.    As is shown from the above, Defendants refused to engage in an interactive dialogue with

Plaintiffs and their counsel.

98.    42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794 of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

99.    Through their actions set forth above, Defendants have violated numerous sections of the ADA regulations implementing Title II of the ADA.

100.    28 C.F.R. § 35.150(a) specifically provided that "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."

101.    When viewed in its entirety, the ELMHS was not (and is not) readily accessible to or usable by Plaintiffs.

102.    28 C.F.R. § 35.130 provides that "(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to

18

gain the same benefit, or to reach the same level of achievement as that provided to others;"

103.  Pursuant to 28 C.F.R. § 35.130 (7) "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability...."

104.  By and through the actions set forth above, Plaintiffs made requests for reasonable modification of Defendants' policies, practices, or procedures, but these requests were routinely denied by Defendants. Accordingly, Defendants are liable to Plaintiffs for violation of 28 C.F.R. § 35.130 (7).

105.  By and through their choices, as outlined above, Defendants committed intentional discrimination.

106.  By and through their failure to respond to Plaintiffs' requests for reasonable accommodation/modification letters, Defendants committed intentional discrimination.

107.  Defendants have been purposeful in their action and, thus, committed intentional discrimination.

108.  Defendants were deliberately indifferent to Plaintiffs' needs as persons with a disability.

109.  Upon information and belief, as a result of the discrimination set forth above, Plaintiffs have suffered the following compensatory damages:

- Loss of potential enhanced eligibility for accelerated release;

- Personal injury related to COVID-19 infection and exposure;

- Pain and suffering related to any personal injury;

- Loss of educational opportunities;

- Invasion of privacy;

- Loss of expectation interests;

- Invasion of their civil rights; and

- Past and future emotional distress, anxiety, confusion, and anguish.

110. Plaintiffs demand a recovery of compensatory and nominal damages in this matter.

111. Plaintiffs demand injunctive relief, including the development and provision of Community Based Integration; assess of what services Plaintiffs may need to function in an outpatient basis (e.g., personal assistant, medications, etc.); the provision of those services on a consistent and regular basis; adequate funding of the above system; adequate training to the Louisiana Department of Health staff on accommodating individuals with disabilities, including psychiatric disabilities; and the provision of ongoing assessment of Plaintiffs' needs as persons with disabilities.

112. Plaintiffs have retained the undersigned counsel and are entitled to recover reasonable attorneys' fees, costs and litigation expenses from Defendant pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

## **COUNT II**
## **VIOLATION OF THE REHABILITATION ACT**

113. Plaintiffs adopt and re-allege the allegations contained in paragraphs 1-112 as if fully stated herein.

114. Plaintiffs bring this claim against Defendants, based upon the Rehabilitation Act, 29 U.S.C. §794, *et seq*.

115. The Rehabilitation Act provides that:

No otherwise qualified individual with handicaps in the United

20

> States, as defined by 7(8) [29 USCS § 706(8)], shall, solely by reason
> of his or her handicap, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance or under
> any program or activity conducted by any Executive agency or by the
> United States Postal Service.  29 U.S.C. § 794(a).

116.   As set forth herein, Defendants violated the Rehabilitation Act by intentionally discriminating against Plaintiffs, solely by reason of their disabilities, in the Eastern Louisiana Mental Health System.

117.   Defendants' choice to warehouse individuals with disabilities at the ELMHS instead of developing a comprehensive outpatient treatment system violates the Rehabilitation Act of 1973.

118.   Defendants' failure to develop a comprehensive outpatient treatment system has caused Plaintiffs increased risk of infection with COVID-19 because they are currently warehoused at the ELMHS and at increased risk of exposure to COVID-19 due to Defendants' inadequate policies and procedures for mitigating the spread of infection.

119.   Upon reasonable belief, Defendants are the recipient of federal funds.

120.   As the recipient of federal funds, Defendants are liable for damages to Plaintiffs as a result of their acts and omissions constituting intentional discrimination.

121.   As set forth above, Plaintiffs have been denied access to the services, programs, facilities, activities and accommodations offered by Defendants solely by reason of their disability, and have otherwise been discriminated against and damaged solely by reason of their

disability as a result of Defendants' Rehabilitation Act violations set forth above.

122.    Plaintiffs have been obligated to retain undersigned counsel for the filing and prosecution of this action. Plaintiffs are entitled to recover those attorneys' fees, costs and litigation expenses from Defendants pursuant to 29 U.S.C. §794(b).

## CLAIM III: VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

123.    Plaintiffs repeat and reiterate every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

124.    At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 USC § 18116 was in full force and effect and applied to Defendant's conduct.

125.    At all times relevant to this action, Section 1557, 42 USC § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

126.    For the reasons set forth above, at all relevant times Plaintiffs have been individuals with disabilities within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and of Section 1557, 42 USC § 18116.

127.    At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and were engaged in the provision of health care. Therefore, Defendants are operating health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

128.    Pursuant to Section 1557, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any

health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

129.   For the reasons fully set forth above, Defendants subjected Plaintiffs to discrimination, solely on the basis of disability, in violation of Section 1557, 42 U.S.C. § 18116.

130.   Defendants discriminated against Plaintiffs by denying their requests for reasonable accommodations.

131.   Plaintiffs are therefore entitled to seek and recover compensatory damages for the injuries and loss they sustained as a result of the Department of Health's discriminatory conduct as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

132.   Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a), the Rehabilitation Act, 29 U.S.C. § 794(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.   This Court awards monetary damages (compensatory and nominal), pursuant to Title II, 29 U.S.C. § 794a(a)2, and 45 CFR § 92.301 and for the harm caused by the LDOH.

B.   This Court order Defendants to develop and provide a comprehensive Community Based Integration for individuals with disabilities.

C.   This Court order Defendants to assess what reasonable accommodation and auxiliary aids/services Plaintiffs may need to function in an outpatient basis (e.g., personal assistant, medications, etc.) and to ensure that Plaintiffs are

provided these reasonable accommodation and auxiliary aids/services on a consistent and regular basis.

D.      This Court order Defendants to maintain adequate funding of the above system.

E.      This Court orders Defendants to provide adequate training to the Louisiana Department of Health staff on accommodating individuals with disabilities, including psychiatric disabilities.

F.      This Court order Defendants to provide ongoing assessment of Plaintiffs' needs as persons with a disability.

G.      This Court order Defendants to provide Plaintiffs with ability to access educational opportunities equivalent to those available to non-disabled individuals who do not reside at ELMHS.

H.      This Court award of reasonable attorneys' fees, costs and litigation expenses pursuant to 29 U.S.C. § 794a(a)2 and 42 U.S.C. § 12205 and 28 C.F.R. § 35.175 and 45 CFR § 92.301.

I.       Such other relief as the Court deems just and proper, and/or is allowable under the ADA, Rehabilitation Act, and Affordable Care Act.


                        Respectfully Submitted,


                        By:/s/ Andrew D. Bizer

                        BIZER & DEREUS, LLC
                        Attorneys for Plaintiff
                        Andrew D. Bizer (LA # 30396)
                        andrew@bizerlaw.com

Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Emily A. Westermeier (LA#
ewest@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996